# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

KANTRELL ROBINSON,      )
     )
       **Plaintiff,**      )
     )
**vs.**      )      **Case No. 19-00852-CV-W-GAF**
     )
**UNION PACIFIC RAILROAD**      )
**COMPANY,**      )
     )
       **Defendant.**      )

## ORDER

Now before the Court is Defendant Union Pacific Railroad Company's ("UP" or "Defendant") Motion for Summary Judgment. (Doc. # 68). Plaintiff Kantrell Robinson ("Plaintiff") opposes. (Docs. ## 74-75). For the following reasons, Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part.[1]

---

[1] Also pending is Defendant's Motion to Strike Michelle Collins's Declaration. (Doc. # 82). Plaintiff cites Collins's declaration throughout her response to Defendant's proposed statement of facts and to support her additional proposed statement of facts. (Doc. # 75). However, Plaintiff did not contemporaneously file the declaration with her response and filed it only after Defendant had submitted its reply suggestions. (*See* Docket Sheet). Plaintiff never sought additional time to file the declaration or leave to file it out of time. (*Id.*). Plaintiff attempts to excuse her dilatory filing and claims Defendant is "overreacting and overreaching," but ultimately acknowledges that it is within the Court's discretion to strike the declaration as "it is late." (Doc. # 85). Upon considering the parties' arguments, the Court finds Defendant would be prejudiced if the declaration is not struck because Defendant did not have the opportunity to challenge the substantive evidence contained therein. Accordingly, Defendant's Motion to Strike is GRANTED, and Michelle Collins's Declaration is hereby STRIKEN from the record. The Court has not considered Collin's Declaration when ascertaining the facts set forth in this Order and conducting the analysis contained herein.

# DISCUSSION

## I. FACTS[2]

### A. The Parties & the Supply Department

Plaintiff is a 45-year-old, black female who was hired by UP on September 20, 2005. (Doc. # 63, ¶ 10; Doc. # 69-2, pp. 1, 3; Doc. # 75-105, 17:7-20). On October 25, 2006, Plaintiff bid into the Utility Clerk position, a union position that paid a daily amount. (Doc. # 69-2, p. 3; Doc. # 69-3, 20:24-21:7; Doc. # 75-105, 252:22-253:15). Throughout her whole employment with UP, Plaintiff has been a member of the Transportation Communications Union (the "Union" or "TCU"). (Doc. # 75-105, 21:3-7). The Collective Bargaining Agreement ("CBA") applies to all employees of UP who are members of the Union. (Doc. # 75-101, 16:24-17:6; Doc. # 75-4). Plaintiff is still employed by UP and currently holds the position of Utility Clerk in Kansas City, Missouri. (Doc. # 69-2, p. 1; Doc. # 75-105, 17:21-25).

UP is an interstate railroad headquartered in Omaha, Nebraska. (Doc. # 69-1, 28:2-8; Doc. # 63, ¶ 2). UP operated a locomotive diesel shop in Kansas City, Missouri ("KC01") and a car materials shop in Kansas City, Kansas ("KC03") until December 2019, when UP closed the shops. (Doc. # 69-1, 17:9-21, 20:4-6; Doc. # 69-7, 79:1-83:23; Doc. # 69-43; Doc. # 75-104, 25:7-19).

---

[2] Several of the facts proposed by both parties were not supported by the evidence cited and therefore are omitted unless uncontroverted by the opposing party. Additionally, many of the facts proposed by Plaintiff included improper argument, conjecture, and personal opinions and are also omitted.

[3] In an effort to controvert Defendant's proposed facts and to support her own proposed facts, Plaintiff submitted her own declaration that adds to or contradicts her deposition testimony. (Doc. # 75-92). Plaintiff also submitted the declaration of Nancy Avina, who had been previously deposed as a witness. (Doc. # 75-97). However, a party cannot defeat summary judgment and create a factual dispute by contradicting their prior testimony in a declaration. *City of St. Joseph, Mo. v. Sw. Bell Tel.*, 439 F.3d 468, 475-76 (8th Cir. 2006). To the extent Plaintiff's and Avina's declarations conflict with their deposition testimony, they are disregarded.

The KC01 diesel shop and the KC03 car shop provided the material needs of UP's Mechanical Department. (Doc. # 69-1, 17:25-19:16).

From 2012 to approximately 2019 or 2020, Craig Mitchell, a white male, held the position of Senior Director of Warehouse Operations and oversaw supply operations at the KC01 and KC03 shops. (Doc. # 69-1, 13:8-14:7, 17:9-18:20). From July 2018 through December 2019, Jennifer Perkins, a white female, was the Manager of Supply Operations and managed the Material Handlers at the KC01 and KC03 shops. (Doc. # 69-5, 17:4-8, 25:9-15, 28:8-22, 67:16-68:25; Doc. # 69-6). From August 2018, Cindi Wood, a white female, served as the 1E Material Supervisor and supervised the Material Handlers at the KC01 and KC03 shops. (Doc. # 69-7, 17:7-20, 106:4-17). As the 1E Supervisor, Wood was responsible for training new Material Handlers and was forklift certified. (Doc. # 69-4, 35:14-17; Doc. # 75-104, 87:16-18). Wood was also a member of the TCU. (Doc. # 69-7, 14:22-15:17).

Material Handlers worked in the Supply Department at both the KC01 and KC03 shops. (Doc. # 75-104, 30:1-31:10, 67:16-68:7). The KC01 diesel shop received and stowed materials at a higher volume than the KC03 car shop. (Doc. # 69-1, 38:21-40:6). As a result, more Material Handlers staffed the KC01 shop. (*Id.*). At times, only one or two Material Handlers would operate the KC03 shop while seven Material Handlers would staff the KC01 shop. (*Id.*; Doc. # 75-104, 30:15-23). From 2018 until the Material Handler position was abolished, there were no more than eight Material Handlers working at either the KC01 or KC03 shops. (Doc. # 69-4, 41:13-18). At the time the position was abolished in December 2019, six of the eight Material Handlers were female. (Doc. # 69-7, 38:7-41:25). At relevant times, the following people held a Material Handler position: (1) Nancy Avina, a Latina female; (2) Michelle Collins, a black female; (3) Michael Serrone, a white male; (4) Melanie Corum, a white female; and (5) James Gale, a white male.

(Doc. # 69, ¶¶ 43, 84; Doc. # 75, ¶¶ 43, 84; Doc. # 69-5, 145:24-146:2). Serrone, who trained for the Material Handler position a few months before Plaintiff, voluntarily left the position because he was unsatisfied with the compensation and overtime opportunities. (Doc. # 69-18, 39:8-40:2; Doc. # 69-19, 15:1-21).

UP had an Equal Employment Opportunity ("EEO") and Affirmative Action Policy that prohibited discrimination, retaliation, harassment, and other offensive behaviors and remarks. (Doc. # 69-9). UP's EEO Department manned the Values Line, an internal hotline that allowed employees to report instances of discrimination, retaliation, and other employment concerns. (Doc. # 69-1, 31:9-16). All employees and managers were made aware of UP's anti-discrimination and anti-retaliation policies via online courses, which employees take when they start and throughout their employment. (Doc. # 69-5, 37:20-39:7, 40:4-6, 41:4-7, 43:18-21, 49:19-50;4, 56:3-57:12; Doc. # 69-1, 24:23-26:13, 28:21-29:14, 31:17-32:5; Doc. # 69-7, 21:14-26:11; Doc. # 69-3, 78:18-80:10, 82:3-6; Doc. # 69-10, 106:4-15, 230:17-25).

**B.    2008 Lawsuit**

On June 3, 2008, Plaintiff filed a sex discrimination, sexual harassment, and retaliation lawsuit against UP and her former manager, Sean Cameron, a white male, in the Circuit Court of Jackson County, Missouri. (Doc. # 69-3, 66:3-69:21; Doc. # 69-11). Specifically, Plaintiff alleged that Cameron made sexual advances towards her, bought her inappropriate gifts, and subjected her to a hostile work environment. (*Id.*). UP investigated Plaintiff's claims and demoted Cameron. (Doc. # 69-3, 68:16-25). However, Cameron remained in the same department as Plaintiff. (*Id.*). Cameron later resigned after Plaintiff complained that the harassment had continued. (*Id.* at 69:4-21). Plaintiff and UP settled these claims in December 2008. (*Id.* at 97:6-16).

Plaintiff alleged that all of her subsequent supervisors and managers learned about her 2008 lawsuit against Cameron and UP because details of her lawsuit were shared in her personnel file and accessible to her ensuing managers. (Doc. # 63; Doc. # 69-3, 98:10-101:5). Specifically, Plaintiff alleged that her former supervisors and managers retaliated against her by failing to promote her. (*Id.*). Plaintiff testified that she saw information about the 2008 lawsuit on a human resources employee's computer screen during an interview. (*Id.*). However, there is no mention or record of the 2008 lawsuit in her personnel file or Supply Department training file. (Doc. # 69-2; Doc. # 69-12). Plaintiff believed UP has since changed human resources software and the information about her 2008 lawsuit may no longer be in her file. (Doc. # 69-3, 98:10-101:5).

Plaintiff's personnel file indicated she had a formal coaching meeting with her supervisor, Bill Vorhoeff, in June 2008 and that Vorhoeff mailed her a letter of warning for attendance in September 2014. (Doc. # 75-40; Doc. # 75-41). Plaintiff testified she was never formally coached by Vorhoeff and denied ever seeing or receiving a letter of warning. (Doc. # 75-105, 82:16-20, 87:16-88:5).

## C. Applications and Bids for Promotions Through 2013

After her initial hire, Plaintiff's supervisor, Steve Nyquist, informed her that employees needed to be in their current position for 12 months before they would be considered for a promotion to another department. (Doc. # 75-105, 70:5-14). Wood received training as Assistant Chief Clerk within four to six months of being hired. (*Id.* at 70:15-71:1). When Plaintiff and others complained to headquarters, they were told it was within the manager's discretion. (*Id.*).

Early in her career with UP, Plaintiff applied for a management position. (Doc. # 75-105, 14:22-25). At that time, Plaintiff had not yet finished her undergraduate education and was told she needed to finish her degree to advance within the company. (*Id.* at 14:25-15:5). In response,

Plaintiff earned an associate degree in approximately 2008, bachelor's degree in 2012, and master's degree in 2015. (*Id.* at 14:6-12, 15:6-15). Like Plaintiff, Perkins began her employment with UP without a bachelor's degree. (Doc. # 75-104, 13:21-14:13, 19:6-10; Doc. # 75-65, p. 3). After Perkins earned her bachelor's degree in 2015, she applied for and was awarded the position of Manager of Supply Operations in 2018. (*Id.*). This was Perkins first and only application for promotion within UP. (Doc. # 75-104, 34:2-35:23, 62:25-63:7). Perkins left UP's employ when her position was abolished. (*Id.* at 17:2-10).

Plaintiff applied for and was denied promotion to a train dispatcher position three times in 2011. (Doc. # 75-105, 116:11-14; Doc. # 75-44; Doc. # 75-45; Doc. # 75-46). Plaintiff's applications were denied at the prescreen level, meaning her name was never shared with the hiring manager because she did not meet the qualifications. (Doc. # 75-44; Doc. # 75-45; Doc. # 75-46; Doc. # 80-6, ¶ 15). Plaintiff was never contacted or interviewed for the position. (Doc. # 75-105, 116:24-117:7, 118:23-119:8, 120:24-121:14). Lisa Scott, a white female who did not have a bachelor's degree and had similar work experience to Plaintiff, was promoted to train dispatcher. (Doc. # 75-105, 121:17-122:3).

On July 26, 2013, Plaintiff applied for and was denied promotion to the Manager of Train Operations position. (Doc. # 75-47). At the prescreen level, it was determined she did not meet the position's requirements because she lacked required supervisory experience. (*Id.*). Plaintiff had obtained her bachelor's degree at this point and stated that she had previous supervisory experience. (*Id.*; Doc. # 75-105, 125:22-126:21). Plaintiff was never contacted regarding her application or interviewed. (Doc. # 75-105, 126:1-21).

**D.      2014 Bid for Material Handler Position**

In December 2014, Plaintiff wanted to exercise her seniority and "bump" into a Material Handler position.  (Doc. # 69-2; Doc. # 69-3, 50:5-21).  One requirement for the position was passing a physical-agility test administered by an independent third-party, BTE Workforce Solutions.  (Doc. # 69-3, 50:25-51:12; Doc. # 69-1, 54:20-55:1; Doc. # 69-13; Doc. # 69-14, ¶¶ 5-9).  UP contracts BTE to perform its pre- and post-employment screenings.  (Doc. # 69-14, ¶ 5).

Plaintiff took the physical-agility test on December 1, 2014, at 2:00 pm, at Select Physical Therapy.  (Doc. # 69-13; Doc. # 69-14, ¶ 7).  Kari Schuster, a physical therapist, administered Plaintiff's test.  (Doc. # 69-13).  Plaintiff testified that Schuster told her she passed the test.  (Doc. # 75-105, 54:12-21).  However, the report initially sent to UP indicated that Plaintiff did not meet the "Upper Level Reach" requirement and had "not met all of the physical demands."  (Doc. # 69-13).  BTE entered Plaintiff's test results as "failed" in its online system on the evening of December 1, 2014.  (Doc. # 69-14, ¶¶ 10-11).

Shortly thereafter, the Bulletin Clerk, Donna Callender, a white female, retrieved the results from the online reporting system.  (Doc. # 69-15, ¶ 6).  Callendar notified Plaintiff's direct supervisor, John Hall, a white male, that Plaintiff had failed the physical-agility test.  (*Id.*).  Hall then told Plaintiff that she had not passed the physical-agility test and would remain in the Utility Clerk position.  (Doc. # 69-3, 50:5-24).  Plaintiff was not allowed to automatically bid into the Material Handler position at that time.  (*Id.*).

At 10:06 p.m. on December 1, 2014, a BTE contractor reviewed Plaintiff's physical-agility test results, determined that she had actually passed, and notified a BTE manager of the error.  (Doc. # 69-14, ¶ 12).  At 8:17 a.m. on December 2, 2014, BTE corrected the error in the online database and sent an email to Callender to notify her that Plaintiff had in fact passed the physical-

agility test.  (*Id.* at ¶ 13).  Callender does not recall being notified that changes were made to Plaintiff's results.  (Doc. # 69-15, ¶¶ 8-9).  Nor did Callender ever recheck the results after receiving the initial report from BTE and conveying the inaccurate results to Hall.  (*Id.* at ¶ 10). Accordingly, Hall did not know that Plaintiff had actually passed the physical-agility test on December 1, 2014.  (*Id.* at ¶¶ 6-10).

On October 22, 2018, in response to an email with the subject line "Bump to supply," Thomas Devereaux informed Plaintiff that records showed that she had passed the physical-agility test on December 1, 2014.  (Doc. # 69-16).  In text messages with her Union representative, Plaintiff admitted she should have asked more questions in 2018 given the conflicting statements from Schuster that she had passed and from Callender that she had failed.  (Doc. # 69-17, p. 4). Plaintiff alleged that UP purposely concealed her results to prevent her from bidding into the Material Handler position in 2014.  (Doc. # 69-3, 50:6-53:10, 137:19-142:15).  Beyond her conjecture about what Hall knew at the time he informed her she had not passed the physical-agility test in December 2014, Plaintiff has no evidence to support this allegation.  (*Id.*).

## E.    Vacancies for Material Supervisor 1E Position

On May 31, 2017, a Material Supervisor 1E position was posted on UP's online bidding system, iTrakForce.  (Doc. # 75-48; Doc. # 80-6, ¶¶ 7-8).  This position was a "right-of-selection" position, which meant UP had the right to put whoever they wanted in the position without considering seniority.  (*Id.*; Doc. # 75-109, 93:21-94:12).  One of the requirements was 12 months in the Supply Department within the previous three years.  (Doc. # 75-48).  Plaintiff did not have any experience in the Supply Department at the time of the vacancy.  (Doc. # 75-105, 128:16-129:12).  The posting instructed candidates to email their resumes to Samantha Miller, a white

female and the then-Manager of Supply Operations.  (Doc. # 75-48; Doc. # 75-102, 11:20-13:14, 95:10-14).

Plaintiff submitted her resume via email to Miller on June 4, 2017 and expressed interest in the open Material Supervisor 1E position.  (Doc. # 75-49).  However, Plaintiff did not bid for the position through UP's online bidding system, iTrakForce.  (Doc. # 80-6, ¶¶ 8-11, 18).  Miller responded by stating that she could not open the attached resume and asked Plaintiff to resend it in a different format or fax it.  (Doc. # 75-49).  Miller did not personally review the qualifications of each applicant for the 1E Material Supervisor position.  (Doc. # 80-6, ¶ 15).  Instead, the iTrakForce system evaluated the applicants' seniority and qualifications through an algorithm.  (*Id.*).  Plaintiff was not interviewed for the position.  (Doc. # 75-105, 131:17-24).  When Plaintiff followed up a few weeks later, Miller informed her that the position had been awarded to someone else.  (Doc. # 75-49).  That individual was Melanie King.  (Doc. # 75-102, 57:25-58:3).  Melanie King is a white female with a high school diploma and less seniority than Plaintiff.  (Doc. # 75-105, 130:16-24).

The Material Supervisor 1E position became vacant again in 2018 and Plaintiff submitted her resume by faxing it to the manager.  (Doc. # 75-105, 153:6-155:23).  There is no evidence that the manager, who would have been Perkins, received Plaintiff's resume.  (Doc. # 75-104, 257:21-259:13).  Wood, who did not have a bachelor's degree, was awarded the position.  (Doc. # 75-104, 261:3-4; Doc. # 75-109, 9:22-10:7).

F.    **2018 Bid for Material Handler Position**

In 2018, Plaintiff learned of a Material Handler opening, a seniority-based position, in the Kansas City yards.  (Doc. # 75-105, 134:13-20).  In October 2018, Plaintiff rebid for a Material

Handler position and was awarded the position after she passed the physical-agility test. (Doc. # 63, ¶ 17).

Prior to Plaintiff officially exercising her seniority, "people were saying she wanted to come over to supply." (Doc. # 75-104, 141:23-142:4). Wood was aware mid-October that Plaintiff intended on bumping into the Material Handler position. (Doc. # 75-109, 102:24-103:14). On or about October 3, 2018, Avina, a Material Handler, attended a Supply Department breakfast. (Doc. # 69-18, 28:2-7). Avina testified that, during the breakfast, she overheard Wood tell Perkins that they needed to hurry up and qualify Serrone as a Material Handler because Wood did not want Plaintiff in the Supply Department. (*Id.*). Avina further testified that Wood did not say that she preferred Serrone because he is white and does not recall if Wood stated she preferred Serrone because he is a man. (*Id.* at 29:8-30:2). Wood denied making such statements and Perkins did not recall hearing them. (Doc. # 69-7, 102:10-23; Doc. # 69-5, 144:5-13). Serrone also denied hearing any comments or discussion about Plaintiff joining the Supply Department. (Doc. # 69-19, 22:16-23:7). Avina did not recall if she reported Wood's comment to the Values Line and there was no record of her reporting the comment in the fall of 2018. (Doc. # 69-18, 30:3-10; Doc. # 80-5).

### 1. *Training in the Supply Department*

Pursuant to the TCU's CBA with UP, employees had a minimum of 30 working days (or six weeks) to "qualify" for positions acquired through the exercise of seniority, including the Material Handler position. (Doc. # 75-4, p. 27; Doc. # 69-7, 103:19-104:10). Perkins testified that most employees qualified for the Material Handler position in two weeks. (Doc. # 69-5, 171:16-21). However, Wood testified it would be highly unusual for someone to be qualified in two weeks and normally took up to six weeks. (Doc. # 69-7, 103:19-104:1). Additionally, prior

to Plaintiff training in the position, Material Handlers' training included a full week of training on each shift and location for all trainees. (Doc. # 75-100, 49:7-24; Doc. # 75-109, 104:14-22).

Plaintiff began training for the Material Handler position on October 30, 2018 and received training through at least January 3, 2019. (Doc. # 69-3, 136:19-137:12; Doc. # 69-20). Because Plaintiff was coming from a different department, she needed a new computer ID to access the Supply Department's inventory management programs. (Doc. # 69-1, 83:7-24). UP's centralized IT Department created and dispensed login information for employees. (*Id.* at 84:10-20). However, the IT Department had not yet sent Plaintiff's new login information, and her new manager, Perkins, was on vacation. (Doc. # 69-3, 136:19-137:12; Doc. # 69-21, ¶ 4; Doc. # 69-22). Serrone's login information was also delayed, and it took a couple days for him to gain access to computer training. (Doc. # 69-19, 40:21-41:7).

Plaintiff claimed her training materials were not ready for her on her first day. (Doc. # 75-105, 137:2-12). Wood testified that she allowed Plaintiff to use her login information so Plaintiff could complete some computer training. (Doc. # 69-7, 134:22-135:8; Doc. # 69-21; Doc. # 69-22). Plaintiff's training log indicated she watched two training and safety videos during her first few days in the Supply Department. (Doc. # 69-20). The training log also indicated Plaintiff began hands-on training on November 6, 2018. (*Id.*). However, Plaintiff claimed that the training log was inaccurate, with some training marked as complete that never occurred. (Doc. # 75-105, 164:4-172:9).

On or about November 7, 2018, Perkins returned from vacation and had a debriefing with Wood to discuss Plaintiff's training progress. (Doc. # 69-22, p. 1). Wood shared that Plaintiff had some forklift training. (*Id.*). Wood also shared that Plaintiff had been using her cell phone in the office and on the floor of the warehouse and that Wood had reminded Plaintiff of the cell phone

policy. (*Id.*). On or about November 8, 2018, Perkins spent a little over an hour reviewing the training matrix and cardinal safety rules with Plaintiff. (*Id.*; Doc. # 69-23, p. 19).

As a Material Handler, Plaintiff needed to safely and efficiently load and unload materials that were delivered to the KC01 and KC03 shops with a forklift. (Doc. # 69-8; Doc. # 69-1, 77:14-17). There is evidence that Plaintiff failed to master the forklift's basic controls as well as evidence that she was able to operate the forklift without incident. (Doc. # 69-5, 177:4-13; Doc. # 69-1, 112:22-113:11; Doc. # 75-2, p. 3; Doc. # 69-22, p. 7; Doc. # 75-74, pp. 54-56). There is also evidence that Plaintiff progressed as she received more training. (Doc. # 75-58; Doc. # 75-104, 184:8-24).

The training log stated Plaintiff received six hours of forklift training on November 13, 2018, but Plaintiff testified she never received six hours of training in one day because the shop was too shorthanded and busy. (Doc. # 75-51; Doc. # 75-105, 171:20-172:4). On that day, Plaintiff was coached twice, once at 9:30 a.m. and once at 12:30 p.m., for failing to set the safety brake, which was a violation of Cardinal Rule 75.7. (Doc. # 69-25; Doc. # 69-24, pp. 6-7). Failing to set the safety brake not only endangered the life of the operator, but also those around them. (Doc. # 69, ¶ 64; Doc. # 75, ¶ 64). Perkins testified that she personally observed Plaintiff not set the safety brake. (Doc. # 75-104, 217:12-18). Plaintiff testified that she never failed to set the safety brake. (Doc. # 75-105, 175:10-15).

Because Plaintiff had committed multiple safety violations, Perkins met with her to discuss her progress and ways in which Perkins could help Plaintiff retain the information. (Doc. # 69-5, 220:16-221:25). Perkins told Plaintiff she would have a quieter space to complete online training but was expected to multitask on the warehouse floor. (Doc. # 69-22, p. 2). They also decided Plaintiff would continue with the training matrix. (*Id.*). Perkins spoke with her direct supervisor

and Mitchell about the training plan as well. (*Id.*). Plaintiff's notes indicated that Perkins told Plaintiff she did not look engaged. (Doc. # 75-64). Plaintiff testified that Perkins tried to convince Plaintiff she did not want to be in the department. (Doc. # 75-105, 249:12-250:8). But Perkins testified she never questioned Plaintiff's desire to work in the department. (Doc. # 75-104, 194:4-23).

Perkins also testified that she wanted Plaintiff to gain more experience on the forklift. (Doc. # 75-104, 208:2-11). To facilitate this, Perkins and Wood would sometimes instruct other Material Handlers to have Plaintiff unload trucks rather than have the available Material Handlers do it. (*Id.*; Doc. # 75-105, 193:21-195:6). This happened even if Plaintiff was in the middle of another job; Perkins and Wood would make Plaintiff pause her current work or have the truck wait so she could unload the truck. (*Id.*). Perkins testified this was for training purposes and not punishment. (Doc. # 75-104, 208:2-11).

Despite Perkins's stated desire to provide Plaintiff with additional opportunities to become proficient on the forklift, Plaintiff trained with Avina at the KC03 shop for only three days. (Doc. # 75-100, 49:7-24). Further, Plaintiff was never trained on third shift. (Doc. # 75-96, ¶ 7). This departed from past training practices. (Doc. # 75-100, 49:7-24; Doc. # 75-109, 104:14-22).

### 2. *Performance Issues*

In addition to the safety violations on November 13, 2018, Plaintiff had other documented performance issues. On November 26, 27, and 28, 2018, Plaintiff got a forklift stuck in a United Parcel Service Ground Freight ("UPGF") trailer. (Doc. # 69-20, p. 2; Doc. # 69-22, p. 3). On November 28, 2018, Plaintiff ran over a pallet and made an unsafe wide turn while operating the forklift. (Doc. # 69-20, p. 2). On November 29, 2018, Plaintiff was coached for failing to wear a hardhat while in the warehouse. (Doc. # 69-25). On November 30, 2018, Plaintiff moved at a

slower pace. (Doc. # 69-20, p. 2). On January 2, 2019, Plaintiff was disciplined for exiting the forklift without lowering the forks to the ground on December 14, 2018. (Doc. # 69-2, p. 9; Doc. # 69-20, p. 3).

Plaintiff testified that she never got the forklift stuck in a trailer and always got out of trailers on her own. (Doc. # 75-105, 192:7-193:1). However, Wood testified that, on more than one occasion, she or another Material Handler would have to help Plaintiff get unstuck when unloading freight trailers. (Doc. # 69-7, 128:12-129:7; Doc. # 69-20, p. 2). Plaintiff testified that Perkins yelled at her about not wearing a hardhat in a required area but did not yell at Corum for the same violation. (Doc. # 75-105, 190:10-25). Plaintiff also disputes that she failed to lower the forks to the ground on December 14, 2018. (Doc. # 75-105, 173:12-175:9, 192:7-193:1). Plaintiff asked to see video footage of her failing to put the forks down, but UP did not produce it. (Doc. # 75-105, 111:3-11; Doc. # 75-104, 242:23-24).

Serrone once dropped heavy equipment off a trailer but was not disciplined. (Doc. # 75-105, 103:23-104:2; Doc. # 75-108, 59:9-60:5). Perkins testified that Serrone was coached and mentored after the incident. (Doc. # 75-104, 199:15-20). Serrone testified that he was not coached. (Doc. # 75-108, 59:9-60:5). Serrone testified that he did not feel comfortable with operating the forklift when he was "qualified" by UP to be a Material Handler. (Doc. # 75-108, 50:4-15, 56:23-25). He also observed others operating forklifts at speeds he was not comfortable with. (Doc. # 75-108, 51:9-53:17).

On March 23, 2019, Corum left the forklift forks two feet off the ground, unattended, for over one hour and received no discipline. (Doc. # 75-6; Doc. # 75-7, p. 14; Doc. # 75-104, 70:18-19). On May 21, 2019, James Gale, a white male, received coaching for leaving the forks off the ground after ten days in the Supply Department. (Doc. # 75-8).

### 3. Plaintiff's Complaints about Training

After Plaintiff was coached for violating UP's Cardinal Safety Rules, she filed an internal complaint via UP's Value Lines with the company's EEO Department at 5:27 p.m. on November 13, 2018. (Doc. # 69-33). During the call, Plaintiff complained that she was not being properly trained on the forklift because of her race. (Doc. # 69, ¶ 88; Doc. # 75, ¶ 88). She also discussed concerns about the results from the 2014 agility test. (Doc. # 75-69).

EEO Manager III Jeff Anderson, a white male, investigated Plaintiff's Claims. (Doc. # 69-33, p. 3; Doc. # 69-35). During his investigation, Anderson learned that Plaintiff believed Wood failed to adequately train her because Plaintiff had filed a sexual harassment claim against her former manager, Cameron—Wood's alleged love interest—in 2008. (Doc. # 69-35, pp. 1-4). Specifically, Plaintiff alleged Cameron and Wood had an explicit and open affair. (*Id.*). Anderson found no evidence supporting Plaintiff's claims. (*Id.* at pp. 4-7). Wood has denied having any type of relationship with Cameron. (Doc. # 69-7, 142:2-22, 153:11-19; Doc. # 69-35, p. 3).

Plaintiff emailed Mitchell on multiple occasions, accusing Perkins of failing to provide adequate, impartial training. (Docs. ## 69-26, 69-27). On November 14, 2018, Plaintiff emailed Mitchell that she had not received her login credentials in a timely manner. (Doc. # 69-27). She also alleged that Wood was not providing adequate training in retaliation for Plaintiff filing the sexual harassment lawsuit in 2008. (*Id.*). Plaintiff wrote that Wood had given Perkins "information" on Plaintiff and that Perkins was "picking at [Plaintiff] for anything minor." (*Id.*). Plaintiff wrote that Perkins and Wood were collaborating to disqualify her from the Material Handler position. (*Id.*).

In response to Plaintiff's emails, Mitchell volunteered to drive from Omaha, Nebraska to Kansas City to "make some operational observations" and "ensure [Plaintiff was] receiving the

training per our established standards." (Doc. # 69-28). Mitchell made the trip to Kansas City the next day. (Doc. # 69-1, 76:14-22, 86:25-87:9, 89:4-10, 89:17-90:5, 90:11-91:16, 93:15-24). However, Plaintiff testified that Mitchell did not actually train her on the forklift, just observed her, and spent less than an hour with her. (Doc. # 75-105, 186:15-187:23).

On November 28, 2018, Plaintiff emailed Mitchell again to complain about her training and wrote that she did not believe Perkins was giving Mitchell "fair and impartial judgment of [her] forklift driving skills." (Doc. # 69-26). Plaintiff asked Mitchell to review the video recordings of her loading and unloading trailers. (*Id.*). She also notified Mitchell that she called Lance Fritz, the CEO of UP, because she believed she was being treated unfairly. (*Id.*).

On December 20, 2018, Plaintiff contacted Mitchell to address her concern that Perkins was pressuring Plaintiff to operate the forklift faster and meet a quota when unloading and moving materials. (Doc. # 75-54; Doc. # 75-105, 209:15-210:23). Later that day, Mitchell emailed Plaintiff and affirmed that safety was critical. (Doc. # 69-30). He wrote that he did not observe any Material Handlers using excessive speeds when he visited. (*Id.*). He stated that there was no quota, but that employees must be proficient on the forklift. (*Id.*). He concluded by stating he believed Perkins had "every intention to help [Plaintiff] successfully gain competence in the warehouse environment" and had "provided (and will continue to provide) additional opportunities for [Plaintiff] to gain competency on the fork lift equipment." (*Id.*).

On November 8, 13, 26, and 28, 2018, Plaintiff sent text messages to Avina, complaining about the training she was receiving from Perkins, Wood, and Corum and asked whether Avina had called the Values Line to report Plaintiff's alleged mistreatment. (Doc. # 69-23, pp. 17-20).

On December 28, 2018, Plaintiff filed a complaint with the Occupational Safety and Health Administration ("OSHA") to allege that UP was engaging in unsafe practices because it had failed

to properly train her on the forklift. (Doc. # 69-1, 104:14-105:22; Doc. # 69-36). OSHA closed the complaint without issuing any citation or penalty. (Doc. # 69-37)

### 4.    *Events Leading Up to Disqualification*

On December 19, 2018, Plaintiff called UP's Employee Assistance Program and stated that, since starting work in the Supply Department, she was experiencing anxiety attacks, fatigue, loss of appetite, and loss of sleep due to the mistreatment she was experiencing at the hands of her supervisor. (Doc. # 69-32). Plaintiff also reported she feared coming to work because of the alleged mistreatment. (*Id.*).

On or about January 3, 2019, Plaintiff provided a doctor's note to Perkins regarding her medical condition. (Doc. # 75-105, 211:22-213:20). Plaintiff's prior experience was that a doctor's note on a prescription pad or regular paper was sufficient. (*Id.*). However, Perkins wanted the note on letterhead and required Plaintiff to obtain the note on letterhead. (*Id.*). Perkins does not recall this situation. (Doc. # 75-104, 190:13-16). Plaintiff later applied for medical leave in mid-January 2019 due to stress. (Doc. # 63, ¶ 27). On January 22, 2019, Plaintiff was retroactively approved for a medical leave of absence from January 17, 2019 to February 24, 2019. (Doc. # 63, ¶¶ 27-28). During her leave, Plaintiff attended counseling. (Doc. # 75-105, 257:18-258:3).

Other people noticed Plaintiff struggling. For example, Collins told Perkins on January 2, 2019 that Collins had never seen forklift training take so long, that Plaintiff was not comfortable on the forklift, and that Plaintiff was "an accident waiting to happen." (Doc. # 69-22, p. 8).

On January 11, 2019, Plaintiff asked Mitchell if she was qualified as a Material Handler. (Doc. # 75-60). Mitchell responded that they were still monitoring her progress and would notify her in the next two weeks regarding qualification. (*Id.*). Plaintiff also contacted her Union representative, Jerry Kirkpatrick, and he attempted to set up a meeting with management. (Doc. #

75-63, pp. 4-5). No meeting occurred and Plaintiff received no further communication from Mitchell or Perkins until she returned from medical leave. (Doc. # 75-105, 214:8-216:3, 217:1-7).

### G. Disqualification from the Material Handler Position

Mitchell, in accordance with Perkins, decided Plaintiff should be disqualified from the Material Handler position because she purportedly could not competently operate a forklift. (Doc. # 69-38; Doc. # 75-104, 203:14-22; Doc. # 75-103, 107:23-108:3). Mitchell also discussed the decision with Assistant Vice President Pete Newton, a representative from Labor Relations, and Jeff Anderson in the EEO Department. (Doc. # 75-103, 108:4-109:9). In Mitchell's opinion, Plaintiff could not safely and efficiently operate the forklift. (Doc. # 69-1, 36:22-37:10).

When Plaintiff returned from medical leave on February 26, 2019, Perkins handed Plaintiff a letter and told her she had been disqualified. (Doc. # 75-105, 216:10-217:22). According to Plaintiff, Perkins was "smirking" when she handed Plaintiff the letter. (*Id.*). Perkins testified that one reason for the disqualification was safety concerns involving the safety brake not being set and the forks being left off the ground. (Doc. # 75-104, 227:5-10). Plaintiff did not repeat the safety violations of failing to set the safety break and leaving the forks up after being coached. (Doc. # 75-104, 224:15-20, 226:23-227:4). Despite this, Perkins testified that Plaintiff did not retain the fundamentals of operating the forklift safely. (*Id.* at 226:23-228:20).

Plaintiff appealed her disqualification through her Union. (Doc. # 69-39, 43:5-14). A hearing was held on March 5, 2019, and Plaintiff's disqualification from the Material Handler position was upheld. (Doc. # 69-40; Doc. # 75-76). Newton made the decision to uphold the disqualification. (Doc. # 75-103, 118:7-25).

During the hearing, Avina testified that Plaintiff and Serrone both received inadequate training. (Doc. # 69-40, pp. 51-57; Doc. # 69-18, 38:11-17; Doc. # 69-19, 42:5-43:10). During

his deposition, Serrone testified that he found the Material Handler training to be overwhelming and inadequate, especially regarding the forklift training. (Doc. # 69-19, 41:12-43:15, 50:4-51:8, 55:21-56:1, 59:5-8, 62:4-18). Specifically, Serrone noted that his training with Wood at the KC01 shop was lackluster when compared to training he received with Avina at the KC03 shop. (*Id.*). Serrone stated that he felt like he needed more training on the forklift. (*Id.*). During the hearing, Collins testified that the Supply Department was understaffed and that it needed more Material Handlers at both locations. (Doc. # 69-40, pp. 58-61).

During the hearing, Clifford Bottorff, a UPS Pickup and Delivery Driver, testified that on December 26, 2018, he made a delivery to the KC01 diesel shop. (Doc. # 69-41, ¶¶ 2, 4). Upon arrival at the KC01 shop, Plaintiff began to unload Bottorff's trailer. (*Id.* at ¶ 5). His trailer was half full and a load of that size typically took no more than 15 minutes to unload. (*Id.*). After waiting more than 15 minutes, Bottorff peeked around the corner of the trailer to see if Plaintiff had unloaded the trailer. (*Id.* at ¶ 6). The trailer was still full. (*Id.*). Bottorff asked another UP employee if Plaintiff was new and whether it was her first time driving the forklift. (*Id.* at ¶ 7). The employee said no. (*Id.*). Bottorff continued to observe Plaintiff unload the trailer. (*Id.* at ¶ 8). Plaintiff's movements on the forklift were erratic. (*Id.*). She continually misapplied the brakes, jammed pallets against the wall, and had to readjust her forklift several times. (*Id.*). Bottorff concluded that Plaintiff did not know how to operate the forklift. (*Id.*). At one point, Plaintiff's driving had tightly wedged one pallet against the trailer. (*Id.* at ¶ 9). Bottorff had to physically pull the pallet away from the trailer so that it could be loaded onto the forklift. (*Id.*). After approximately 45-50 minutes passed, Bottorff received a message from his supervisor asking him about the status of his delivery and why this delivery was taking so long. (*Id.* at ¶ 10). At this point, Bottorff stepped in to help Plaintiff unload the trailer to speed up the process. (*Id.*). Bottorff

was certified to operate both standing and seated forklifts and was retrained and recertified every few years. (*Id.* at ¶ 3). Bottorff believed Plaintiff was the worst forklift driver he had ever seen. (*Id.* at ¶ 10).

## H. Charge of Discrimination

On February 26, 2019, Plaintiff filed a charge of discrimination with the EEOC and the Missouri Human Rights Commission ("MHRC"). (Doc. # 63-1). The Charge alleged that, after returning from medical leave in November 2014, Plaintiff's supervisor, whom she had previously made internal complaints against, informed her that she had not passed the agility test and could not bump into the Material Handler position. (*Id.*). Four years later, in 2018, Plaintiff learned that she did in fact pass the agility test. (*Id.*). Plaintiff alleged that her supervisor intentionally prevented her from bumping into the Material Handler position in 2014 because she had reported him to UP's EEO hotline for race and sex discrimination as well as retaliation. (*Id.*). Plaintiff also alleged that she had been discriminated and retaliated against because of her race and sex over the course of her career because she had not been promoted. (*Id.*). Plaintiff further alleged that, on or about October 3, 2018, a coworker overheard two supervisors stating they did not want Plaintiff to work in the Supply Department and preferred a white male in the position. (*Id.*). Finally, Plaintiff alleged that, after reporting the incidents of discrimination and retaliation in the Supply Department to UP's EEO hotline, she was disqualified from the Material Handler position on February 26, 2019. (*Id.*).

On March 6, 2019, Plaintiff filed an amended charge of discrimination to include a new allegation that in December 2018, she was disciplined for safety issues relating to the operation of the forklift while other "light skinned" and non-black employees were not disciplined. (Doc. #

63-2).  On July 29, 2019, the EEOC sent Plaintiff a right-to-sue letter notifying her that it had closed the file on her charge.  (Doc. # 63-3).

## I.    Amended Complaint

On November 13, 2020, Plaintiff filed an Amended Complaint that included new allegations of discrimination and retaliation.  (Doc. # 63).  Plaintiff alleged that she had experienced a number of discriminatory and retaliatory events since filing this lawsuit.  (*Id.* at ¶¶ 30-35).  Plaintiff alleged that, in approximately August 2020, she voiced concerns to her immediate supervisor, Jeremy Schultz, a white male, about the safety of company vehicles that she and other Utility Clerks were instructed to drive.  (*Id.* at ¶ 30; Doc. # 69-3, 23:15-26:10; Doc. # 69-44, 7:19-15:25).  Plaintiff and other Utility Clerks called UP's Safety Hotline to report their concerns about the safety of the vehicles.  (Doc. # 69-44, 9:23-10:2).  Plaintiff additionally reported her concerns to the Vice President of Safety, Erin Batt, a white female.  (Doc. # 69-44, 10:18-11:1).  Plaintiff told Batt that the issues with the company vehicles were not resolved after Plaintiff followed the local chain of command.  (*Id.*).  Plaintiff alleged Schultz yelled at her in retaliation for going over his head with her complaints.  (Doc. # 63, ¶ 30; Doc. # 69-3, 23:15-26:10; Doc. # 69-44, 12:2-15:22).  Plaintiff also claimed she was the only person he yelled at that had filed Safety Hotline complaints.  (Doc. # 75-106, 12:23-14:14).  During her deposition, Plaintiff acknowledged that the vehicles in question were either repaired or replaced with new ones.  (Doc. # 69-3, 25:13-24; Doc. # 69-44, 16:23-25).  Plaintiff was not disciplined for calling the Safety Hotline and Batt.  (Doc. # 69-44, 16:1-22).

Plaintiff alleged that, in August 2020, she was "dinged" for attendance because she opted not to work 16 hours in a 24-hour period due to her job site being short-staffed.  (Doc. # 63, ¶ 31).  Plaintiff claimed she was exhausted and did not feel it was safe to drive.  (*Id.*).  During her

deposition, Plaintiff admitted she was not disciplined but stated she could have been if she had any other attendance issues within the 90-day period. (Doc. # 69-3, 29:23-30:12). Plaintiff reported her concerns to UP's headquarters in Omaha, Nebraska. (Doc. # 63, ¶ 31; Doc. # 69-3, 27:20-29:19; Doc. # 27-44, 19:7-12). In response to Plaintiff's complaint and those from other Utility Clerks, UP changed its policy and brought in contractors to prevent employees from having to work overtime. (Doc. # 69-3, 27:20-29:19; Doc. # 69-45).

Plaintiff also alleged that managers have made derogatory comments throughout her employment about women in the workplace, as recently as September 2020. (Doc. # 63, ¶ 32). The comments allegedly included: "how can [one] work with all these women all the time" and "you women are always catfighting or bickering." (*Id.*). The managers included Michael Buttry, Aaron Keith, Bill Vorhoeff, Renaldo Smith, Matt Hall, John Hall, and Steve Nyquist. (Doc. # 75-105, 64:12-65:14, 265:17-266:2, 270:15-271:3). Plaintiff claimed she did not include these allegations of sex discrimination in her initial complaint because she did not have room to include them in her Charge and believed that she could not include information from that many years ago. (Doc. # 69-44, 26:14-24, 28:1-29:15).

Plaintiff alleged her manager, Steve O'Neal, a white male, insisted that she hold her urine until a train crew had been swapped out, even though she had been holding it for two hours. (Doc. # 63, ¶ 33). Plaintiff alleged she had to tell O'Neal that she would urinate herself so that he would allow her to use the restroom. (*Id.*). O'Neal apologized to her the next day. (Doc. # 69-44, 32:25-33:10). Plaintiff believed O'Neal was retaliating against her because she had called the Safety Hotline to report issues with the vehicles. (*Id.* at 33:15-34:11).

Plaintiff alleged her current supervisor, Michael O'Hara, a white male, refused to speak with her directly and would relay messages to her through other managers. (Doc. # 63, ¶ 34; Doc.

# 75-106, 36:5-22, 39:1-16).  Plaintiff believed O'Hara was not speaking to her in retaliation for filing the Charge of Discrimination and the current lawsuit against UP.  (Doc. # 69-44, 34:18-35:8).  Plaintiff also believed O'Hara was not speaking to her because he was friends with Perkins and Wood.  (*Id.* at 36:5-11).  Plaintiff further believed O'Hara was retaliating against her because he refused to do anything she asked of him and refused to say hello to her.  (*Id.* at 36:12-37:11, 39:1-16).

None of the managers or supervisors discussed above talked with Plaintiff about calling the Values Line, her Charges of Discrimination, and the lawsuits against UP.  (Doc. # 69-44, 56:1-5; Doc. # 69-46, ¶¶ 3-5).  Others working in a Utility Clerk position, including non-minorities, have also experienced hostility from current managers.  (Doc. # 69-19, 24:10-26:18).

## J.    Relief Chief Clerk/Yard Office Coordinator Position

Plaintiff's Amended Complaint also included allegations surrounding her disqualification from the Relief Chief Clerk/Yard Office Coordinator ("Relief Chief Clerk") position.  (Doc. # 63, ¶ 35).  In December 2019, Plaintiff bid into a higher-paying position of Relief Chief Clerk.  (Doc. # 75-105, 17:23-18:21, 252:9-18).  She received the position based on seniority.  (*Id.*).  Plaintiff desired the position because it paid more than the Utility Clerk position and had a schedule she preferred.  (*Id.* at 18:10-13).  The Relief Chief Clerk's duties included dispatching drivers around Kansas City, processing paperwork, using a "CAD" device to track when and where trains were arriving, managing other clerks, and dispatching those clerks to locations as needed.  (*Id.* at 20:1-16).  The position also involved coordinating with five other clerks each shift, as well as quarter managers, dispatchers, and yardmasters.  (*Id.* at 20:17-23).

Plaintiff alleged she was disqualified from her position as Relief Chief Clerk for failing to report that the engineer of an originator train was over 20 minutes late on October 4, 2020.  (Doc.

# 63, ¶ 35).  Plaintiff further alleged that she was unaware of any policy requiring her to make such a report and did not receive any coaching or written discipline before being demoted.  (*Id.*).  Per Plaintiff, other individuals had been written up and coached on mistakes multiple times before disqualification.  (*Id.*).

Under UP's Clerical Policy No. 3, Chief Clerks were required to notify the on-duty Run-Through manager if trains or crew members were delayed by 20 minutes.  (Doc. # 69-46, ¶ 14).  Clerical policies are included in all Chief Clerk training materials.  (*Id.*).  O'Neal and the Superintendent of the Yard, Ryan Curtis, a white male, decided to disqualify Plaintiff because her failure to report the late crew member purportedly caused massive delays, prevented delivery of freight, and resulted in thousands of dollars of losses to UP.  (Doc. # 69-46, ¶¶ 16, 20).  When O'Neal decided to disqualify Plaintiff from the Relief Chief Clerk position, he did not know about her 2008 lawsuit or the pending lawsuit.  (Doc. # 69-46, ¶¶ 3-5).

In a letter dated October 5, 2020, received by Kirkpatrick, UP stated that Plaintiff was disqualified "due to [her] inability to consistently and adequately perform [her] job duties as required."  (Doc. # 75-15).  In a letter dated October 14, 2020, UP stated that Plaintiff was disqualified for "fail[ing] to effectively fulfill [her] responsibility as Chief Clerk, including not reporting an employee's tardiness to the on-duty Run Thru Manager and becoming aggressively argumentative with another manager, when questioned about the situation."  (Doc. # 75-16).  Plaintiff denied she was aggressive with any manager.  (Doc. # 75-106, 64:19-67:2).

Plaintiff appealed her disqualification through her Union.  (Doc. # 69-44, 45:23-47:7).  The decision to disqualify her was upheld.  (*Id.*).  During her disqualification hearing on October 14, 2020, Jacob Hammond, Manager of Terminal Operations, testified that the delay resulted in costs of approximately $1,500.  (Doc. # 75-14, p. 27).  Testimony during the hearing also established

that the replacement crew boarded the train an hour-and-a-half late and the train departed an hour after they boarded. (*Id.* at p. 28). John Hall was the decision-maker who upheld the disqualification. (Doc. # 75-36). Plaintiff believed the disqualification was retaliation because John Hall was the decision-maker. (Doc. # 75-106, 46:11-20).

Plaintiff also believed she was disqualified because of her race and in retaliation for filing Charges of Discrimination and lawsuits against UP. (Doc. # 69-44, 47:15-48:13; Doc. # 69-45). Plaintiff believed white Chief Clerks have made similar errors but were not disqualified from the position. (Doc. # 69-44, 48:5-50:8, 63:16-64:11; Doc. # 69-45). Specifically, Plaintiff testified that Jennifer Frazier and Kim Peterson both failed to put individuals onto trains, but they were coached rather than disqualified. (Doc. # 75-106, 48:5-50:8). Plaintiff testified that the length of delays caused by Frazier's and Peterson's violations were similar to the delay her violation caused. (*Id.*). Jerry Kirkpatrick, a 41-year employee of UP, testified that he has observed other employees committing the same violation as Plaintiff, but those individuals were not disqualified. (Doc. # 75-101, 49:3-9). Further, Cheryl Harris was not disqualified for about eight years even though she routinely "cussed out" her supervisors. (Doc. # 75-106, 63:14-64:11).

## K.    Miscellaneous Values Line Complaints

Over the course of her career, Plaintiff has made a number of calls to the Values Line alleging discrimination, harassment, and retaliation. (Doc. # 69-47). On September 26, 2013, Plaintiff called the Values Line alleging that her supervisor, Bill Vorhoeff, a white male, placed her in a lower position with less pay in retaliation for reporting a work-related injury. (*Id.* at pp. 1-4). The internal EEO report stated that the complaint was substantiated and indicated that Vorhoeff later explained to Plaintiff why she did not get the higher pay due to another employee being trained for the position. (*Id.*). Plaintiff was apparently "fine" with that explanation. (*Id.*).

On July 28, 2014, Plaintiff reported her supervisor, John Hall, a white male, to the Values Line. (*Id.* at pp. 6-7). Plaintiff claimed Hall discriminated against her because she was pregnant and had refused to accommodate her pregnancy. (*Id.*). Plaintiff claimed others on light duty had been allowed to train in Assistant Chief or Chief Clerk positions, positions she believed would not require her to drive over rough terrain and potholes. (*Id.*). The report indicated UP completed its investigation almost a year later, but no resolution was listed. (*Id.*).

On May 11, 2015, Plaintiff reported that Hall and the Manager of Train Operations, John Tucker, a white male, were harassing her and following her around after other managers claimed Plaintiff left her shift early. (*Id.* at pp. 10-11). Plaintiff claimed Hall and Tucker were targeting her because of her race. (*Id.*). UP's internal EEO team found Plaintiff's claim unsubstantiated. (*Id.*). The investigator determined that Hall and Tucker were ensuring that all employees, including Plaintiff, stayed for the duration of their shifts. (*Id.*).

On May 12, 2015, Plaintiff reported to Hall, who in turn reported to the Values Line, that her supervisor, James Foster, a white male, was discriminating against her because of her race and sex. (*Id.* at pp. 14-15). Foster had approached Plaintiff for leaving early. (*Id.*). The internal EEO team also investigated this claim and found it unsubstantiated because managers were ensuring that all employees stayed for the duration of their shifts. (*Id.*)

On March 3, 2016, Plaintiff reported that Tucker and other managers had been falsifying write-ups for safety violations after the family of a deceased employee sued UP for his death. (*Id.* at pp. 17-19). Plaintiff believed Tucker and the other managers were blaming her and fellow Utility Clerks for the employee's death and retaliating against them. (*Id.*). The internal EEO team investigated the claims and found them unsubstantiated. (*Id.*).

On August 12, 2016, Plaintiff reported that her managers, Chad Toussaint and Scott Tormondson, both white males, were retaliating against her for filing a work-related injury report. (*Id.* at pp. 21-22). Plaintiff claimed that Toussaint and Tormondson had interrogated her and were attempting to intimidate her so she would not file a Federal Employers Liability Act claim. (*Id.*). The internal EEO team investigated and found the claim unsubstantiated but instructed Touissant to take a course regarding proper management of employee injury reporting. (*Id.*).

On February 15, 2017, Plaintiff reported that her managers, Tormondson and Robert Montgomery, a white male, were retaliating against her for filing safety-related complaints with the Federal Railroad Association ("FRA") and OSHA since August 2016. (*Id.* at pp. 25-26). Plaintiff claimed Tormondson and Montgomery were harassing her and nitpicking her work. (*Id.*). She also claimed they unfairly reprimanded her for using her cellphone in the yard despite using it for company business and for excessive chatter on the radio when others were not disciplined for the same. (*Id.*). The report stated her complaint was unsubstantiated and closed. (*Id.*).

On July 31, 2017, Plaintiff reported that Senior Manager Term Operations Dean Ridder, a white male, and Manager Yard Operations Brent Sargent, race unknown, were harassing her. (Doc. # 69-47, pp. 28-29). Plaintiff claimed Ridder and Sargent accused her of using her cell phone while on the job and failed to apologize when she showed them her cell phone call log, which proved she had not been using her phone. (*Id.*). The internal EEO team investigated and found the complaint unsubstantiated. (*Id.*).

On March 12, 2018, Plaintiff reported that black employees had been passed over for promotions in favor of white employees with less seniority. (*Id.* at pp. 35-37). Plaintiff cited an instance when Odis Smith, a black male, was not trained for a position but a white woman was instead. (*Id.*). Plaintiff also claimed she was accused of being late and docked pay because of her

race.  (*Id.*).  Also on March 12, 2018, Plaintiff reported that Kelli Dunn, a white female, had been trying to get rid of Utility Clerks because of their age and rate of compensation.  (*Id.* at pp. 39-41).  Plaintiff stated that most clerks are over the age of 40, tend to get sick more often than younger employees, and take more days off.  (*Id.*).  The internal EEO team investigated both complaints and found them unsubstantiated.  (*Id.* at 35-37, 39-41).

Plaintiff did not complaint about her treatment on the Values Line when supervised by Coleman Bell, Jason Young, James Foster, and Timothy Speichert.  (Doc. # 75-105, 55:6-57:10).  Plaintiff also testified that she decided not to report some policy violations because she did not feel her complaints would result in changes.  (Doc. # 75-105, 61:21-62:2).

**L.     Alleged Disparate Treatment between Minority & White Employees**

John Hall supervised Plaintiff for approximately two years.  (Doc. # 75-105, 32:11-16).  Plaintiff claimed Hall applied certain workplace restrictions on only black employees.  (*Id.* at 33:1-44:24).  For example, Hall implemented a policy where employees transporting crews from hotels were not allowed to leave the truck when stopping at gas stations.  (*Id.* at 33:1-35:15).  Plaintiff believed Hall only enforced this policy against Black employees because she never heard any white employees complain about it.  (*Id.*).  Hall also tracked the Utility Clerks via GPS.  (*Id.* at 33:17-21).  Plaintiff routinely heard her black coworkers complain of Hall questioning their routes but never heard similar complaints from her white coworkers.  (*Id.* at 36:14-37:9).  Plaintiff also believed Hall disciplined black employees for infractions for which he did not discipline her white coworkers.  (*Id.* at 38:14-39:22).  Plaintiff based this belief on conversations with other employees in the break room.  (*Id.*).

Plaintiff reported Hall to the Values line.  (*Id.* at 37:10-20).  She also called UP's CEO, Lance Fritz, on his cell phone at dinner time on a Sunday to complain about Hall.  (*Id.* at 46:13-

47:20).  After reporting him, Plaintiff claimed Hall stopped communicating with her, watched her every move, and smirked at her.  (*Id.* at 37:25-38:10, 45:21-25).

At some point, Plaintiff was issued marks against her attendance by James Foster.  (Doc. # 75-105, 88:19-90:18).  The marks did not result in formal discipline that remained on her record.  (*Id.* at 30:5-12, 89:13-22).  Based on conversations in the break room, Plaintiff believed that a white coworker missed three days and received no counseling or marks against his/her attendance, but her black coworkers were receiving warnings for similar absences.  (*Id.* at 89:23-90:18).

**M.  Alleged Harassment of Female Employees**

Most of the individuals Plaintiff worked with were men.  (Doc. # 75-105, 41:3-8).  The majority of supervisors were also men.  (*Id.* at 253:24-254:22).  Plaintiff heard male supervisors make the following comments: (a) "you women are always catfighting and bickering"; (b) "how do you work with those women all the time"; and (c) "you guys [referring to women] can't get along, always fussing, always complaining."  (*Id.* at 64:12-65:8, 266:3-8, 265:17-269:22, 270:25-271:3).  These male supervisors include Aaron Keith, Bill Vorhoeff, Renaldo Smith, Matt Hall, and John Hall.  (*Id.* at 265:17-266:2).

**II.  LEGAL STANDARD**

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate if the evidence, viewed in the light most favorable to the [nonmovant] and giving [the nonmovant] the benefit of all reasonable inferences, shows there are no genuine issues of material fact and [the movant] is entitled to judgment as a matter of law."  *Price v. N. States Power Co.*, 664 F.3d 1186, 1191 (8th Cir. 2011).  "Once the moving party has made and supported their motion, the nonmoving party must proffer admissible evidence

demonstrating a genuine dispute as to a material fact." *Holden v. Hirner*, 663 F.3d 336, 340 (8th Cir. 2011). Essentially, parties resisting a motion for summary judgment must support their allegations with "'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.'" *Moody v. St. Charles Cty.*, 23 F.3d 1410, 1412 (8th Cir. 1994) (first alteration in original) (quoting *Gregory v. Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid a summary judgment." *Id.* Summary judgment should not be granted if a reasonable jury could find for the nonmoving party. *Woodsmith Publ'g Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III. ANALYSIS

Plaintiff's Amended Complaint contains causes of action for race discrimination, retaliation, and hostile work environment in violation of 42 U.S.C. § 1981 and sex and race discrimination, retaliation, and hostile work environment in violation of Title VII, 42 U.S.C. § 2000e-2.[4] (Doc. # 63). Specifically, Plaintiff alleges her disqualification from the Material Handler position in 2019 and her disqualification from the Chief Clerk/Yard Office Coordinator position in 2020, as well as a hostile work environment, stem from race and/or sex discrimination and/or retaliation for taking actions protected by § 1981 and/or Title VII. (*Id.*). Plaintiff has not asserted any whistleblower claims despite including allegations and facts indicating some of the alleged discrimination and/or retaliation occurred due to her reporting safety concerns through the Safety Hotline, to corporate officers, and to OSHA. Defendant seeks summary judgment on all remaining claims.

---

[4] Although it does not explicitly state such, the Amended Complaint can be read to allege race discrimination under Title VII because Count II incorporates all prior paragraphs. (Doc. # 63).

## A.     Untimely Claims of Discrete Acts of Discrimination/Retaliation

Claims filed pursuant to 42 U.S.C. § 1981 must be filed within four years of its accrual date.  28 U.S.C. § 1658(a).  To proceed with a Title VII claim, a plaintiff must file a charge of discrimination with the EEOC within 300 days of the discriminatory or retaliatory act.  42 U.S.C. § 2000e-5(e)(1).  The Supreme Court has held that discrete acts of discrimination or retaliation falling outside these time limitations do not become timely because they share a connection to other acts that are timely.  *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 111-12 (2002).  Instead, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* at 113.  In light of this controlling authority, the Court previously dismissed Plaintiff's failure to promote claims arising from December 2014.  (Doc. # 33).

Defendant seeks summary judgment in its favor on each of Plaintiff's § 1981 claims predating October 24, 2015 and Title VII claims predating May 2, 2018 that UP failed to promote her since she started working for the company in 2005 because of race and/or sex or in retaliation for her 2008 lawsuit and/or other protected activities.  (Doc. # 69, pp. 38-40).  In her response to the pending motion, Plaintiff states that she does not seek to revive untimely claims, but then argues that Eighth Circuit precedent from 1997 requires the Court to allow all of her race discrimination and related retaliation claims to move forward.  (Doc. # 74, pp. 8-10).  Plaintiff does not make a similar argument for her sex discrimination claims.  (*Id.*).

In 1997, the Eighth Circuit decided *Kim v. Nash Finch Company*, 123 F.3d 1046 (8th Cir. 1997).  *Kim* did not involve issues regarding timeliness of claims.  *See id. generally*.  Even if it did, the *Morgan* decision is controlling.  Thus, contrary to Plaintiff's contention, *Kim* does not save any race discrimination and related retaliation claims for discrete acts that predate October 24, 2015 if raised under § 1981 and May 2, 2018 if raised under Title VII.

The § 1981 claims for which Defendant is entitled to summary judgment include, but are not limited to: (1) being told she would not be considered for promotion until she had worked in her current position for 12 months; (2) three separate denials of promotions to train dispatcher in 2011; (3) denial of promotion to Manager of Train Operations in July 2013; (4) placement in a lower-paying position in September 2013; and (5) failure to accommodate pregnancy in July 2014. The Title VII claims for which Defendant is entitled to summary judgment include, but are not limited to: (1) all claims pleaded in the alternative to § 1981 claims; (2) any write-up for allegedly false safety violations in 2016 stemming from a coworker's death; (3) denial of promotion to Material Supervisor 1E in June 2017; (4) loss of pay due to being late as reported in March 2018; and (5) denial of promotion to Material Supervisor 1E in 2018. However, Plaintiff may use evidence of these alleged discriminatory acts to support hostile work environment claims or as background evidence in support of her timely claims. *See Morgan*, 536 U.S. at 113; *Rebouche v. Deere & Co.*, 786 F.3d 1083, 1087 (8th Cir. 2015) (discriminatory actions occurring outside statutory period allowed for hostile work environment claims) (citing *Morgan*, 536 U.S. at 117).

**B.      Discrimination Claims**

Where no direct evidence of discrimination is present, a plaintiff must satisfy her burden of proving intentional discrimination by using the familiar burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for both § 1981 and Title VII claims. *Williams v. United Parcel Serv., Inc.*, 963 F.3d 803 (8th Cir. 2020) (§ 1981 claim); *Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881, 887 (8th Cir. 2015) (Title VII claim). Under that framework, the plaintiff "must first establish a prima facie case of discrimination." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1046 (8th Cir. 2011) (en banc). If the plaintiff meets her burden, then the defendant must articulate a legitimate, non-discriminatory reason for the discriminatory act.

*Id.* If the defendant does so, the plaintiff bears "the ultimate burden . . . to produce evidence sufficient to create a genuine issue of material fact regarding whether [the defendant's] proffered nondiscriminatory justifications are mere pretext for intentional discrimination." *Id.* (quotation omitted).

### 1. *Race Discrimination Prima Facie Case*

To establish a prima facie case for race discrimination under either § 1981 or Title VII, Plaintiff must show: (1) that she is a member of a protected group; (2) that she was qualified for the position or was meeting UP's legitimate job expectations; (3) that she suffered an adverse employment action; and (4) that the circumstances permit "an inference of discrimination." *Beasley v. Warren Unilube, Inc.*, 933 F.3d 932, 937 (8th Cir. 2019) (quotation omitted) (discharge under § 1981 and Title VII); *see also Nelson v. USAble Mut. Ins. Co.*, 918 F.3d 990, 993 (8th Cir. 2019) (failure to promote under § 1981); *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 903 (8th Cir. 2015) (demotion under Title VII).

There is no dispute that Plaintiff is a member of a protected group and that she suffered adverse employment actions when she was disqualified from the Material Handler position and the Relief Chief Clerk position. Defendant argues that Plaintiff was not meeting its legitimate job expectations in either the Material Handler or Relief Chief Clerk positions or that she was treated differently than similarly situated coworkers. (Doc. # 69, pp. 42-44). Plaintiff argues material questions of fact prohibit the Court from ruling in Defendant's favor on these prongs. (Doc. # 74, pp. 10-17). The Court agrees with Plaintiff.

Regarding the Material Handler position, Defendant cites to its evidence that Plaintiff failed to safely operate the forklift despite its purported efforts to provide her additional training and by extending her training period. However, Plaintiff has provided conflicting evidence that

she could safely operate the forklift. Moreover, evidence exists that the training provided to Plaintiff deviated from past practices and that, despite an extended training period, Plaintiff did not receive adequate oversight and coaching from knowledgeable forklift operators. Viewing the facts in the light most favorable to Plaintiff, it appears Plaintiff was left to figure it out on her own while performing assigned work. Facts support that when she did receive proper coaching, such as setting the safety brake and lowering the forklifts, Plaintiff did not repeat her mistakes. Consequently, material factual disputes remain as to whether Plaintiff was meeting UP's legitimate job expectations prior to it disqualifying her from the Material Handler position.

Defendant argues that one cannot infer discrimination when it disqualified Plaintiff from the Material Handler position because she was given more training opportunities and an extended training period and because Serrone also received inadequate training. (Doc. # 69, pp. 42-43). Even though UP undisputedly extended Plaintiff's training period, evidence exists that Plaintiff did not receive the amount and level of training represented on the training log. That Serrone also received inadequate training does not alone defeat an inference of discrimination. Serrone, a white male, was not disqualified, or even disciplined, despite evidence that he had dropped heavy equipment when operating a forklift.[5] Instead, he voluntarily chose to move to another department. If anything, Serrone's inadequate training, coupled with the lack of discipline for an arguably serious safety violation, strengthens the inference of discrimination.

Turning to the Relief Chief Clerk position, Defendant relies on Plaintiff's violation of Clerical Policy No. 3, which required her to notify the Run-Through Manager that the train

---

[5] Defendant argues Serrone was already qualified when he dropped the heavy equipment, and therefore was not similarly situated to Plaintiff. (Doc. # 80, p. 170). However, Defendant provided no evidence to support that Serrone was qualified at that point in time. (*Id.*). At minimum, there is a material dispute regarding whether Serrone and Plaintiff were similarly situated.

engineer was running more than 20 minutes late. (Doc. # 69, pp. 43-44). Plaintiff admits she did not comply with the policy, and evidence supports that she should have known about the policy. Defendant claims that Plaintiff's mistake was extremely costly and caused massive delays of freight deliveries and for other trains. However, the evidence presented in conjunction with the pending motion does not support the level of severity Defendant professes. Defendant argues UP lost "tens of thousands of dollars" due to Plaintiff's violation. However, the only evidence of the loss amount comes from Plaintiff's disqualification hearing during which the Manager of Terminal Operations testified the delay cost approximately $1,500. That amount is well short of "tens of thousands of dollars" and hardly noteworthy given the size of UP. Further, the only evidence of the delays cause by Plaintiff's violation is that the replacement crew boarded the train an hour-and-a-half later. To a lay person, a 90-minute delay, while significant, does not appear massive. Without evidence of the supposed ripple effect, Defendant's claims seem exaggerated.

Defendant argues that no evidence exists that any other similarly situated coworker violated Clerical Policy No. 3. However, Jerry Kirkpatrick testified that others did violate the policy, but were not disqualified. This evidence suggests Plaintiff could violate the policy but still meet UP's job expectations. Additionally, Plaintiff provided evidence that other white Chief Clerks had caused delays of similar lengths and were coached rather than disqualified. Given that evidence suggests this was Plaintiff's only performance issue in the Relief Chief Clerk position, Plaintiff's proffered evidence permits an inference of discrimination. Consequently, material factual disputes remain, precluding summary judgment based on Plaintiff's ability to prove the prima facie case of race discrimination for both disqualifications.

## 2.      *Sex Discrimination Prima Facie Case*

The elements of the prima facie case for sex discrimination mirror those for race discrimination.  *See Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 878 (8th Cir. 2014).  Again, there is no dispute that Plaintiff is a member of a protected class and suffered adverse employment actions.  For the same reasons as previously discussed regarding race discrimination, material questions of fact exist regarding whether Plaintiff was meeting UP's legitimate job expectations.  The question here is whether Plaintiff has evidence that gives rise to an inference of unlawful gender discrimination.

As noted above, Serrone, a white male, was not disqualified or disciplined following an arguably serious safety violation.  Because a similarly situated employee outside Plaintiff's protected class (female) was treated differently, a reasonable fact-finder could find an inference of unlawful gender discrimination when Plaintiff was disqualified from the Material Handler position.  Thus, Plaintiff's sex discrimination claim for disqualification from the Material Handler position survives summary judgment.

However, the same cannot be said for Plaintiff's disqualification from the Relief Chief Clerk position.  Plaintiff has no evidence that similarly situated employees outside her protected class of female were treated differently.  Plaintiff's identified comparators are both female and Kirkpatrick's testimony does not identify if the "others" he witnessed violate the same policy were male or female.  Nor does Plaintiff have evidence that the decision-makers who initially disqualified her from the Relief Chief Clerk position (O'Neal and Curtis) made derogatory remarks about women or otherwise discriminated against women.  Consequently, Plaintiff cannot establish the fourth prong of her prima facie case for her claim that she was wrongfully disqualified from

the Relief Chief Clerk position due to her sex and summary judgment in Defendant's favor is warranted on this claim.

### 3. *Legitimate, Non-Discriminatory Reason & Pretext under* **McDonnell Douglas**

Defendant next argues that Plaintiff cannot rebut its legitimate, non-discriminatory reasons for her disqualifications from both the Material Handler and Relief Chief Clerk/Yard Office Coordinator positions. Defendant asserts its reason for disqualifying Plaintiff from the Material Handler position was that she could not safely and competently operate a forklift. Defendant asserts it disqualified Plaintiff from the Relief Chief Clerk position because she violated Clerical Policy No. 3 and caused costly disruptions to business operations. These are the same reasons Defendant has provided for why Plaintiff did not meet legitimate job expectations. As discussed above, Plaintiff has submitted sufficient evidence to create a material dispute regarding the validity of Defendant's reasons. Accordingly, a fact-finder must resolve whether Defendant's reasons are merely pretext.

## C. Hostile Work Environment Claims

Hostile work environment claims arising under Title VII and § 1981 are analyzed under an identical standard. *Eliserio v. United Steelworkers of Am. Local 310*, 398 F.3d 1071, 1076 (8th Cir. 2005). To establish her hostile work environment claims, Plaintiff must show that: (1) she is a member of a protected class; (2) that she was subjected to unwelcome harassment; (3) the harassment was because of membership in the protected class; and (4) the harassment affected a term, condition, or privilege of her employment. *Singletary v. Mo. Dept. of Corrs.*, 423 F.3d 886, 892 (8th Cir. 2005).[6]

---

[6] Plaintiff explicitly stated she is not pursuing a hostile work environment claim based on coworker harassment. (Doc. # 74, p. 19).

The Eighth Circuit has set "a high bar for conduct to be sufficiently severe or pervasive in order to trigger a Title VII violation." *Paskert v. Kemna-ASA Auto Plaza, Inc.*, 950 F.3d 535, 538 (8th Cir. 2020). Even "some conduct well beyond the bounds of respectful and appropriate behavior is nonetheless insufficient to violate Title VII." *Id.* The federal harassment standards are "demanding to ensure that Title VII does not become a general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quotation omitted). The Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment." *Id.*

To determine if the alleged harassment has affected a condition of employment, the conduct must be viewed both objectively by a reasonable person and subjectively by the victim. *Singletary*, 423 F.3d at 892. A work environment that is permeated with discriminatory intimidation, ridicule, and insult so severe and pervasive that it alters the conditions of the victim's employment creates an abusive working environment. *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 618 (8th Cir. 2007). Actionable conduct must be extreme in nature, not merely rude or unpleasant. *Id.* "Allegations of a few isolated or sporadic incidents will not suffice; rather, the plaintiff must demonstrate the alleged harassment was so intimidating, offensive, or hostile that it poisoned the work environment." *Id.* (quotation omitted). These high standards are designed to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher*, 524 U.S. at 788 (quotation omitted).

Plaintiff admits she does not have the typical evidence of severe and pervasive harassment in the workplace. (Doc. # 74, p. 19). Instead, she argues that her case is similar to that in *Madison*

*v. IBP, Incorporated*, 257 F.3d 780 (8th Cir. 2001), *vacated by* 536 U.S. 919 (2002). However, *Madison* is distinguishable from the allegations made by Plaintiff.

In *Madison*, the plaintiff was subjected to unwanted physical and verbal harassment, including male coworkers regularly grabbing her buttocks and breasts, rubbing against her, calling her derogatory names, and using racial slurs against her children, throughout her employment for at least seven years. *Madison I*, 257 F.3d at 788. Supervisors were aware of the harassment and did nothing to intervene. *Id.* She was also passed over for 23 promotions, mostly in favor of white men, from 1989-1997. *Id.* at 789. Following a jury trial, the Eighth Circuit affirmed that "she produced an abundance of evidence that she was subjected to a pervasively hostile work environment." *Id.* at 805.

Contrast this with Plaintiff's evidence. She has no evidence of any physical assault or any racial slurs used. Plaintiff's evidence of derogatory comments about women are sporadic statements she heard various male managers generally make about female employees bickering, catfighting, and nitpicking over her 15 years with the company. None of these statements were sexual or crude in nature or directed specifically at Plaintiff. Evidence, when viewed in Plaintiff's favor, supports that Plaintiff sought promotions nine times. In four instances, she was eliminated at the prescreen level because human resources determined she did not meet the position's qualifications. In two instances, Plaintiff did not submit an application through iTrakForce. The remaining three instances are the 2014 bid for the Material Handler position, the 2018 bid for the Material Handler position, and the 2020 bid for the Relief Chief Clerk position. Plaintiff has no evidence beyond her speculation and conjecture that Defendant's explanation for finding her unqualified to fill the 2014 Material Handler position is false. She was awarded the promotions she sought in 2018 and 2020 and her disqualifications from those positions are subjects of claims

of discriminatory discrete acts.  Her other evidence of harassment is managers treating her in less than civil ways by smirking at her, avoiding her, monitoring her excessively, and similar behaviors. While certainly unpleasant, Plaintiff's evidence pales in comparison to the pervasive harassment the plaintiff in *Madison* suffered.  And even if the harassment was more severe and pervasive, Plaintiff has no evidence that the alleged harassment is tied to her race and minimal evidence that it is tied to her sex.  Plaintiff cannot survive summary judgment with a "mere scintilla of evidence." *Moody*, 23 F.3d at 1412.

Ultimately, Plaintiff does not have sufficient evidence to establish that her work environment was so intimidating, offensive, or hostile that it was poisoned and altered the terms and conditions of her employment.  *See, e.g., Paskert*, 950 F.3d at 537-39 (conditions of employment not altered where male supervisor attempted to rub plaintiff's shoulders and hug her, made multiple statements he could "have" her, and stated several times that he should not have hired a woman and wanted to make her cry); *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759-60 (conditions of employment not altered where plaintiff claimed that owner and operators made racially offensive remarks ("Jap," "nip," "gook") to him approximately once a month for two years).  Accordingly, Defendant is entitled to summary judgment in its favor on Plaintiff's hostile work environment claims.

## D.  Retaliation Claims

Like discrimination claims, where no direct evidence of retaliation is present, the *McDonnell Douglas* burden-shifting framework applies.  *See Ellis v. Houston*, 742 F.3d 307, 319 (8th Cir. 2014) (§ 1981); *Recio v. Creighton Univ.*, 521 F.3d 934, 938 (8th Cir. 2008) (Title VII). Thus, Plaintiff must first establish a prima facie retaliation case.  *Williams*, 963 F.3d at 807.  To do so, Plaintiff must show "'(1) protected activity, (2) subsequent adverse employment action, and

(3) a causal relationship between the two.'" *Id.* (quoting *Kim*, 123 F.3d at 1060). A causal relationship exists where the retaliatory motive is the "but-for cause" of the adverse action. *Id.* (§ 1981) (citing *Sayger v. Riceland Foods, Inc.*, 735 F.3d 1025, 1032 (8th Cir. 2013)); *Donathan v. Oakley Grain, Inc.*, 861 F.3d 735, 739 (8th Cir. 2017) (Title VII).

Defendant argues Plaintiff cannot establish a causal connection between her protected activities and her disqualifications because the temporal proximity is too great, UP took actions to address Plaintiff's concerns after she reported them, and the decision-makers were not aware of her protected activities. (Doc. # 69, pp. 49-51). Plaintiff does not address Defendant's arguments. (Doc. # 74, pp. 20-22). Instead, she argues that she was systematically retaliated against like the plaintiff in *Kim*, and therefore, it is a question for the jury on whether the causal connection element is met. (*Id*). However, the Court believes Plaintiff misconstrues *Kim* in light of developments of law since it was decided.

In *Kim*, the plaintiff, an Asian-American, applied for two separate promotions. *Kim*, 123 F.3d at 1052. Both times, the employer promoted a younger, white individual with less experience and education. *Id.* After being passed over a second time, the plaintiff filed charges with the EEOC and related state agency, alleging the employer unlawfully failed to promote him both times on the basis of race, national origin, and age. *Id.* The plaintiff alleged that, immediately after filing his charge, the employer began to "systematically retaliate" against him by no longer assigning him to fill in for a supervisor, giving him lower performance evaluations, orally warning him about his poor attitude, characterizing him as unwilling to assume more job responsibilities, placing him under constant surveillance, excluding him from meetings, and placing falsified reprimands in his personnel file. *Id.* at 1052-53. A fair reading of *Kim* indicates that what the panel in 1997 called "systematic retaliation" would today be characterized as a retaliation claim

based on a hostile work environment. *See Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1042 (8th Cir. 2007) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

In *Burlington Northern*, the Supreme Court recognized that retaliation claims under Title VII need not be based solely on discrete adverse employment actions but could also be based on a hostile work environment. *Burlington N.*, 548 U.S. at 67 (holding anti-retaliation provision of Title VII forbids the same scope of conduct prohibited by anti-discrimination provision). The Court then "establishe[d] a standard to define the concept of a hostile work environment for the purpose of retaliation claims under Title VII." *Stewart*, 481 F.3d at 1042 (citing *Burlington N.*, 548 U.S. at 68). The Court held that actions are materially adverse and actionable if they "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68 (quotation omitted).

As discussed in Section III.C., Plaintiff cannot establish she "experienced harassment so severe and pervasive to constitute a materially adverse action." *Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799, 807 (8th Cir. 2019). Further, Plaintiff's own continued complaints to the Values Line and Safety Hotline are evidence that the alleged harassment she experienced would not dissuade a reasonable person from making a charge of discrimination. Instead, the evidence is that Plaintiff was subjected to "petty slights, minor annoyances, and simple lack of good manners," which is insufficient to deter one from complaining to the EEOC. *Clegg v. Ark. Dept. of Corr.*, 496 F.3d 922, 929 (8th Cir. 2007) (quotation omitted).

Plaintiff's retaliation claim is quite similar to the one made in *Clegg*. There, the plaintiff claimed that many of the acts that were discriminatory were also done in retaliation for her complaints. *Clegg*, 496 F.3d at 929. Like Plaintiff, the *Clegg* plaintiff alleged the employer failed to provide adequate training, denied her access to employment tools, unfairly added negative

reports and reprimands to her personnel file, and treated her differently than her coworkers, among other issues. *Id.* The Eighth Circuit held that "[a]ny harm evidenced in the record was at most trivial" and affirmed the district court's dismissal of her claim. *Id.* Although Plaintiff's disqualification from two separate positions is not trivial, those are discrete adverse employment actions that have independent remedies and are not numerous enough to establish a hostile work environment. *See Carpenter*, 481 F.3d at 618 ("Allegations of a few isolated or sporadic incidents will not suffice.").

The anti-discrimination and anti-retaliation statutes "do[] not set forth a general civility code for the American workplace. An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Carpenter*, 481 F.3d at 619. Summary judgment in Defendant's favor on Plaintiff's retaliation claim based on a hostile work environment is appropriate.

As previously mentioned, Plaintiff did not address Defendant's motion for summary judgment on her retaliation claims regarding UP's discrete employment acts of disqualifying Plaintiff from the Material Handler position in 2019 and the Relief Chief Clerk position in 2020. (Doc. # 74, pp. 20-22). Her argument was solely focused on "systematic retaliation," which is more accurately described as retaliation based on a hostile work environment as explained above.

When a party fails to address an issue raised in a summary judgment motion, that party's argument on the issue is waived. *See Ames v. Nationwide Mut. Ins. Co.*, 760 F.3d 763, 771 (8th Cir. 2014). Accordingly, to the extent Plaintiff had retaliation claims based on specific discrete adverse employment actions by UP, including the disqualifications from the Material Handler

position in 2019 and the Relief Chief Clerk in 2020, Plaintiff has waived her arguments. Summary judgment in Defendant's favor is warranted.

## <u>CONCLUSION</u>

For the reasons set forth above, Defendant's Motion for Summary Judgment is DENIED on the following claims: (1) Plaintiff's race discrimination claim for her 2019 disqualification from the Material Handler position; (2) Plaintiff's race discrimination claim for her 2020 disqualification from the Relief Chief Clerk position; and (3) Plaintiff's sex discrimination claim for her 2019 disqualification from the Material Handler position. Defendant's Motion for Summary Judgment is GRANTED on all other pending claims.

**IT IS SO ORDERED.**

                                 _____

                                 GARY A. FENNER, JUDGE
                                 UNITED STATES DISTRICT COURT

DATED: